MESSAGE PHOTO-PLAY CO., INC., Respondent, *v.* GEORGE H. BELL, Commissioner of Licenses of the City of New York, Appellant.

First Department, July 13, 1917.

**Municipal corporations — theatre licenses, city of New York — suit to enjoin threatened revocation of license for moving picture theatre — powers of commissioner of licenses — evidence not justifying temporary injunction.**

Suit to enjoin the defendant as commissioner of licenses in the city of New York from interfering with the exhibition of a moving picture film relating to " birth control " and from revoking or threatening to revoke the plaintiff's theatre license. Evidence examined, and *held,* that the threatened action of the defendant was not an abuse of the discretion vested in him by the Legislature and was not capricious or arbitrary, or founded upon erroneous information, and that his proposed action was a justifiable exercise of the police power to protect public morality, welfare and decency.

In such action the question of the constitutional right to freedom of speech is not involved, but merely the right of the plaintiff to conduct a business which would be unlawful without a license.

The Legislature has power to require a license for public theatrical and motion picture exhibitions, and also to censor such productions in order that they may be regulated and controlled in the interest of morality, decency, public safety and welfare.

Under section 641 of the Greater New York charter as amended, the commissioner of licenses has delegated power to issue or revoke licenses according to his judgment and discretion, to be exercised in good faith and impartially, and where there is room for an honest difference of opinion as to the action of said commissioner in revoking a license his action cannot be annulled or controlled collaterally by the courts by mandamus or injunction.

Where there is no evidence that the threatened action of such commissioner is in bad faith, it will be presumed that he is acting honestly in the exercise of fair and impartial discretion and judgment.

The merits of the proposed action of said commissioner should not be determined upon conflicting affidavits on a motion for a temporary injunction.

APPEAL by the defendant, George H. Bell, as commissioner of licenses of the city of New York, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 6th day of June, 1917, granting plaintiff's motion for an injunction *pendente lite* enjoining and restraining him from in any manner interfering with plaintiff's exhibition of a moving picture film entitled "Birth Control," and from in any manner revoking or threatening to revoke the license heretofore issued by him to one Anhalt as licensee of the Park Theatre at Columbus Circle and Fifty-ninth street, borough of Manhattan, New York, and from in any manner revoking or threatening to revoke the license of any licensee in whose theatre said motion picture film may be exhibited or may be advertised to be exhibited.

*E. Crosby Kindleberger* [*Terence Farley* and *George P. Nicholson* with him on the brief], for the appellant.

*Jonah J. Goldstein*, for the respondent.

LAUGHLIN, J.:

This is a suit in equity for a permanent injunction to the same effect as the temporary injunction contained in the injunction order from which the appeal is taken. The plaintiff shows by its complaint and affidavits, among other things, that it is engaged in manufacturing and producing motion picture films and in leasing and selling them; that it has manufactured and produced the motion picture film "Birth Control" and has arranged to produce the same at the Park

Theatre and has at great expense advertised the presentation thereof; that the film consists of various episodes in the life of one Margaret H. Sanger, showing how, in the course of her duties as a nurse, she became interested in the subject; that performances are to be limited to adults and have been so advertised; that the film had been viewed by persons of repute and standing in the community who had expressed their views in favor of its production and had been passed by the national board of review and that the film contains no scenes which are lewd or lascivious or disgusting in thought, nature or character, or that in any manner tend to create degenerate influences upon the morals or arouse the thoughts or emotions to indecent conclusions; that prior to the day on which the film was to be first presented the defendant notified the licensee that he had had the picture reviewed by representatives of his department and by citizens whose judgment he valued, and had received and fully considered their reports, and that in his judgment the exhibition was immoral, indecent and directly contrary to public welfare, and that in view of the pending war a plan to limit birth control should not be made a part of amusement, entertainment or recreation in the metropolis, and that for those reasons the exhibition should not be given in a licensed theatre, and if given, action would be taken against the licensee of the theatre under the authority vested in him by the charter and Code of Ordinances of the city. The plaintiff contends that the film is not indecent, immoral or contrary to public welfare and that the reasons assigned by defendant for refusing to permit the exhibition are arbitrary, unjust, unreasonable, unwarranted and confiscatory in their nature and in violation. of law and interfere with the freedom of contract. It is charged that the licensee of the theatre will not, in view of defendant's action, permit the production and that other licensees have notified plaintiff that they will not allow its production for the same reason and that plaintiff has no adequate remedy at law.

On the part of the defendant affidavits made by the deputy commissioner of licenses and by others who viewed the photoplay, known as " Birth Control," on the afternoon of May 5, 1917, the day before it was to be produced at the Park Theatre,

First Department, July, 1917.              [Vol. 179.

set forth in full the headings and subheadings that were thrown on the screen in connection with the pictures and state that in their opinion the play tends to ridicule the public authorities and the provisions of section 1142 of the Penal Law forbidding the dissemination of contraceptive knowledge, and that the dissemination and advertising of such methods for the prevention of conception offends in the extreme against the public welfare and that the play is not alone immoral in teaching people to prevent conception, but that it is entirely opposed to public welfare in that it is a propaganda to limit the production of children and is also against the public welfare in that it distinctly raises a class issue, setting before the public the squalor, poverty and ignorance of the poor, owing to their lack of information with respect to the prevention of conception, and the luxury and small families of the rich due to their ability to acquire from physicians knowledge and means of preventing conception and also depicts the wealthy as contributing funds for the prosecution of those who attempt to enlighten the poor and lowly with respect to birth control and for the avowed purpose of maintaining the poor as the servant and laboring classes, and that in their opinion the dissemination of knowledge of contraceptive methods to all classes of persons, married and unmarried, would tend to immorality. Other affidavits were presented by defendant including one by himself, showing that Mrs. Sanger was tried and convicted for maintaining a clinic in Brooklyn for the dissemination of information on the subject of birth control and that she has served her sentence of one month and that her sister and husband have also been convicted for the distribution of literature in support of her propaganda for birth control. The defendant states in his affidavit that in his judgment the film tends to teach immorality and is entirely opposed to the public welfare, and that the film has for its main purpose the exploitation of Mrs. Sanger who was persistent in violating the law, and tends to bring into disrespect the officials in charge of the enforcement of the criminal statutes against the dissemination of contraceptive methods; that the film clearly advertises that conception may be controlled and that Mrs. Sanger knows how it may be prevented and how childbirth may be controlled;

that a propaganda of this character is, in his opinion, contrary to public welfare and would, through indiscriminate publicity and discussion, cause an increase of immorality and would bring to the attention and knowledge of young unmarried people that there are safeguards which may be used to prevent conception, and would have a tendency to arouse class hatred, as it tends to show that the rich have small families and favor the poor having large families. Some of the pictures and subheadings depict Mrs. Sanger as a nurse attending an under-nourished woman who is exhausted from having too many children and is surrounded by squalor and in bed, in labor pains and about to give birth to a child, while there are several of her small children half-starved, emaciated and ill-clad about her, and the birth of her child shows the doctor warning the woman not to have another child, and shows her pleading with him to instruct her with respect to birth control, and that he refuses the advice on the ground that the law forbids it, and shows her then pleading with Mrs. Sanger for like information, and depicts the same woman resorting to malpractice to avoid the birth of a child, from which she dies, and shows that these were the circumstances which led Mrs. Sanger to inaugurate her propaganda for birth control. The picture further depicts her distributing pamphlets apparently containing prescriptions to prevent conception, and her arrest and trial and conviction; and the final picture shows her behind prison bars serving her sentence, with the subtitle " No matter what happens, the work shall go on." It is not claimed that the means of preventing conception are stated or in any manner conveyed; but that there are such means known to Mrs. Sanger is clearly represented. This is a sufficient summary of the respective claims for the purposes of the appeal.

It is contended in behalf of the respondent that the purpose of the motion picture is to create public sentiment in favor of the repeal of the statute prohibiting the dissemination of information with respect to birth control, and that it has a constitutional right to agitate the repeal of a statute. We are not concerned with the freedom of speech guaranteed by the Constitution (Art. 1, § 8). We have to do with the question

of revoking a license, which is not property but merely a temporary permit to conduct a business that would be unlawful without it. (*People ex rel. Lodes* v. *Department of Health,* 189 N. Y. 187.) This action necessarily rests on a concession that the plaintiff has no constitutional or other right, on the theory of freedom of speech or of the public press or otherwise, to give public exhibition of the film in question at an *unlicensed* theatre; for if it has, then the defendant's revocation of the license will not affect its rights and could not be enjoined, for on that theory no license was required. (See *Matter of Whitten,* 152 App. Div. 506.) It has been, however, authoritatively settled that it is not only competent for the Legislature of the State to require a license for public theatrical and motion picture exhibitions, but also to censor such productions in order that they may be regulated and controlled in the interest of morality, decency and public safety and welfare. (*Mutual Film Corporation* v. *Ohio Industrial Commission,* 236 U. S. 230; *Mutual Film Corporation* v. *City of Chicago,* 224 Fed. Rep. 101; *Matter of Franklin Film Mfg. Corporation,* 253 Penn. St. 422; *Buffalo Branch, Mutual Film Corporation* v. *Breitinger,* 250 id. 225; *Block* v. *City of Chicago,* 239 Ill. 251; *Matter of Ormsby* v. *Bell,* 218 N. Y. 212. See, also, *Matter of Stubbe* v. *Adamson,* 220 N. Y. 459.) It is not necessary to consider the power of the Legislature in the premises, but only the authority delegated by it to the defendant. By section 641 of the Greater New York charter (Laws of 1901, chap. 466), as added by chapter 475 of the Laws of 1914, the Legislature delegated to the commissioner of licenses, by very broad and comprehensive language, authority to grant and revoke licenses, as follows:

" The commissioner of licenses shall have cognizance and control of the granting, issuing, transferring, renewing, revoking, suspending and canceling: * * *

" 4. Of all licenses in relation to theatres and concerts now issued under the provisions of sections fourteen hundred and seventy-three, fourteen hundred and seventy-four, fourteen hundred and seventy-five and fourteen hundred and eighty-three of the Greater New York charter, by the police commissioner. * * *

" The commissioner of licenses is hereby vested with all

the powers and functions now exercised in relation to licenses by (1) the mayor pursuant to the Code of Ordinances of the City; * * * (4) by the police commissioner in relation to theatres and concerts; * * *."

By section 31 of article 2 of chapter 3 of the Code of Ordinances of the City of New York, adopted during 1916, the commissioner of licenses was authorized, among other things, to regulate and control all motion-picture theatres, and he is *directed* to appoint such inspectors as may be necessary to enable him to carry out the provisions of that article; and by section 41 the inspectors appointed by him are required, among other things, to investigate the character of exhibitions in motion-picture theatres, and to report to the commissioner any offense " against morality, decency or public welfare committed in said exhibitions." The form of license granted by the commissioner is not given in the record, but section 2 of article 1 of chapter 3 of the Code of Ordinances provides that said licenses " shall be uniform and may, in the discretion of the commissioner, contain provisions and conditions which, in his judgment, may be essential for the welfare and benefit of the people of and visitors to the city." (See Cosby's Code Ord. [Anno. 1917] pp. 38, 41, 42, 32, 33.) These statutory provisions and ordinances, the validity of which are not and could not well be questioned, necessarily delegate to the commissioner authority to issue and to revoke licenses according to his judgment and discretion, to be exercised, of course, in good faith and impartially and conscientiously according to what he believes to be in the interest of morality or decency or public safety or public welfare. It is not the judgment and discretion of those who are interested in exploiting a film commercially, as is the plaintiff, or of citizens generally, or even the courts, but that of the commissioner *only*, that is called into action. The commissioner, however, must not abuse the discretion vested in him by acting capriciously or arbitrarily, or on false information and without reasonable ground for apprehending that the public morality or decency or safety or welfare will be endangered; but the extent of inquiry collaterally by the courts with respect to his action is whether there is reasonable ground upon which such apprehension may honestly rest in the exercise of a fair and legal

discretion, and if not, the court may require him to act or enjoin him from acting; but if the question be doubtful and there be room for an honest difference of opinion, then the matter must be left to the official to whom the Legislature has delegated authority, and his action in refusing to grant a license, or in revoking one granted, cannot be annulled or controlled collaterally as by mandamus or injunction. (*People ex rel. Schwab* v. *Grant*, 126 N. Y. 473; *Matter of Ormsby* v. *Bell, supra; People ex rel. Rota* v. *Baker*, 136 App. Div. 7; *Genesee Recreation Co.* v. *Edgerton*, 172 id. 464; *People ex rel. Cumisky* v. *Wurster*, 14 id. 556; *People ex rel. Ritter* v. *Wallace*, 160 id. 787; *People ex rel. Lodes* v. *Department of Health, supra; People ex rel. Peixotto* v. *Board of Education*, 212 N. Y. 463; *Matter of Franklin Film Mfg. Corporation, supra; People ex rel. Van Norder* v. *Sewer Commission*, 90 App. Div. 555; *Bainbridge* v. *City of Minneapolis*, 131 Minn. 195; for decisions in which the same rule is stated but mandamus was issued, see *People ex rel. Empire City Trotting Club* v. *State Racing Comm.*, 190 N. Y. 31; *People ex rel. Cosby* v. *Robinson*, 141 App. Div. 656.) There is no evidence that the threatened action of the defendant is in bad faith, and it must, therefore, be presumed that he is acting honestly in the exercise of fair and impartial discretion and judgment. (*City of Buffalo* v. *Hill*, 79 App. Div. 402.) The merits of the action should not be determined on conflicting affidavits, nor should a temporary injunction issue in such case against the official in whom the law has vested the duty of acting in the premises. (See *Matter of Whitten, supra; Genesee Recreation Co.* v. *Edgerton, supra; People ex rel. Ritter* v. *Wallace, supra.*) I am of opinion that it has not been shown that the threatened action of the commissioner will, if consummated, constitute an abuse of the discretion vested in him, or that it will be capricious and arbitrary or founded upon erroneous information, or that he has not reasonable ground to apprehend that public morality or decency or the public welfare will be endangered by the presentation of this motion picture film. It is immaterial that the plaintiff proposes voluntarily to restrict admission to adults, for that action it may change at any time and admit all those whom the law permits to attend motion picture shows. The nature of the subject dealt with by

this motion picture in itself is evidence that there is room for an honest opinion on the part of the defendant that the presentation of the photo-play will be injurious to public morality, decency and welfare. The Legislature has declared it to be against the public interests to have contraceptive information disseminated. It is not too much to say of this record, in addition to the other things which have been alluded to, that it fairly appears that the concentration of the minds of those in attendance at such a production on this question of birth control for a considerable period of time — for the film is long — may engender a desire to obtain the information, of the existence of which they are thus assured, and lead to violations of the law. I am of opinion that the action of the commissioner is justified both in the interests of public decency and public welfare. I think that the rule of *ejusdem generis* should not be applied in construing the ordinance; but without the ordinance and by virtue of the statute conferring upon the commissioner authority to grant and to revoke licenses, he necessarily has a broad discretion in the interests of public welfare. He would surely have the right to forbid, under pain of revocation of the license, a production that would by reflecting upon race or religion, inflame or incite part of the community to disorder. He would in time of war be authorized, and it would be his duty, to prevent any exhibition at a licensed theatre that might be to the prejudice or disadvantage of the State or nation. The exercise of such authority would be well within the police power of regulation for the public welfare.

It follows, therefore, that the order should be reversed, with ten dollars costs and disbursements, and the motion denied, with ten dollars costs.

CLARKE, P. J., SMITH, PAGE and SHEARN, JJ., concurred.

Order reversed, with ten dollars costs and disbursements, and motion denied, with ten dollars costs.